HOWARD HEINZ, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 79059, 79450.   Promulgated August 7, 1936.

*H. Stanley Hinrichs, Esq.*, for the petitioner.
*Fred R. Angevine, Esq., J. Sterling Halstead, Esq., Harry W. Forbes, Esq.*, and *A. Chauncey Newlin, Esq.*, filed briefs *amici curiae*.
*John H. Pigg, Esq.*, for the respondent.

OPINION.

STERNHAGEN: The Commissioner determined deficiencies in petitioner's individual income tax of $11,428.86 for 1931 and $22,633.73 for 1932. Two questions of law require decision. The facts are stipulated, but it is not necessary to set forth the entire stipulation.

■ The petitioner's transactions here in question were in two different stocks, but a detailed statement of the facts of one may be taken as typical of the other. As to one, suffice it to say, that petitioner sold, on November 24, 1931, 2,000 shares of Pennroad Corporation stock, after having held them for more than two years; on the next day he bought 2,000 shares of Pennroad stock, which he in turn sold two days later, with a resulting loss, the character of which is now questioned.

As for the other transaction, the petitioner, on October 30, 1931, owned 300 shares of class A stock of the American Cyanamid Co. Of these, 278 shares had been acquired more than two years before and were therefore "capital assets" as defined by the Revenue Act of 1928, section 101 (c) (8).[1] Leaving aside antecedent details not necessary for a consideration of the matter to be decided, the statutory cost of the 300 shares was $24,828.78. On October 30, 1931, petitioner sold the 300 shares at a price of $4.535 per share, and received $1,360.50, thus sustaining a loss of $23,468.28 upon the entire 300 shares. As to so much of this loss as was properly apportionable to the 278 shares which had been owned more than two years, the loss was "a capital loss" as defined in section 101 (c) (2).[1] Twenty

---

[1] SEC. 101. CAPITAL NET GAINS AND LOSSES.

\*   \*   \*   \*   \*   \*   \*

(c) *Definitions.*—For the purposes of this title—

\*   \*   \*   \*   \*   \*   \*

(2) "Capital loss" means deductible loss resulting from the sale or exchange of capital assets.

(3) "Capital deductions" means such deductions as are allowed by section 23 for the purpose of computing net income and are properly allocable to or chargeable against capital assets sold or exchanged during the taxable year.

(4) "Ordinary deductions" means the deductions allowed by section 23 other than capital losses and capital deductions.

\*   \*   \*   \*   \*   \*   \*

(8) "Capital assets" means property held by the taxpayer for more than two years (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale in the course of his trade or business. For the purposes of this definition—

(A) In determining the period for which the taxpayer has held property received on an exchange there shall be included the period for which he held the property exchanged, if under the provisions of section 113, the property received has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as the property exchanged.

(B) In determining the period for which the taxpayer has held property however acquired there shall be included the period for which such property was held by any other person, if under the provisions of section 113, such property has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as it would have in the hands of such other person.

(C) In determining the period for which the taxpayer has held stock or securities received upon a distribution where no gain is recognized to the distributee under the provisions of section 112 (g) of this title or under the provisions of section 203 (c) of the Revenue Act of 1924 or 1926, there shall be included the period for which he held the stock or securities in the distributing corporation prior to the receipt of the stock or securities upon such distribution.

\*   \*   \*   \*   \*   \*   \*

days later, on November 19, 1931, petitioner bought 278 class A shares for $1,430.35 and thereby, in view of section 118, Revenue Act of 1928,[2] precluded the deduction of a proportionate part of the loss sustained by the sale of October 30. On November 27, he sold for $1,136.08 the 278 shares which he had acquired on November 19; and the basis for determining the gain or loss upon this sale was fixed by section 113 (a) (11), Revenue Act of 1928,[3] as the sum of the basis which would have been applicable to the original 278 shares plus the difference between the October 30 sale price and the higher November 19 purchase price.

The Commissioner treated the shares sold on November 27 as if they had been held for more than two years, and the loss from their sale as if it were a statutory "capital loss" which became a statutory "capital deduction" as defined in section 101 (c) (3).[1] The taxpayer insists that the property sold on November 27 was not in fact held for more than two years and was therefore not a capital asset but was squarely within the statutory definition of "ordinary deduction" found in section 101 (c) (4).[1] He urges that the shares sold on November 27 may not be treated either as the shares purchased more than two years earlier or as taking the place of such shares.

There can be no doubt that, taken literally, the provisions of the Revenue Act of 1928 support the taxpayer's contention. The shares sold on November 27 had in fact been owned only since the pre-

---

[1] See footnote No. 1 on page 886.

[2] SEC. 118. LOSS ON SALE OF STOCK OR SECURITIES.

In the case of any loss claimed to have been sustained in any sale or other disposition of shares of stock or securities where it appears that within thirty days before or after the date of such sale or other disposition the taxpayer has acquired (otherwise than by bequest or inheritance) or has entered into a contract or option to acquire substantially identical property, and the property so acquired is held by the taxpayer for any period after such sale or other disposition, no deduction for the loss shall be allowed under section 23 (e) (2) of this title; nor shall such deduction be allowed under section 23 (f) unless the claim is made by a corporation, a dealer in stocks or securities and with respect to a transaction made in the ordinary course of its business. If such acquisition or the contract or option to acquire is to the extent of part only of substantially identical property, then only a proportionate part of the loss shall be disallowed.

[3] SEC. 113. BASIS FOR DETERMINING GAIN OR LOSS.

(a) *Property acquired after February 28, 1913.*—The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property; except that—

\* \* \* \* \* \* \*

(11) WASH SALES OF STOCK.—If substantially identical property was acquired after December 31, 1920, in place of stock or securities which were sold or disposed of and in respect of which loss was not allowed as a deduction under section 118 of this Act, or under section 214 (a) (5) or 234 (a) (4) of the Revenue Act of 1921, the Revenue Act of 1924, or the Revenue Act of 1926, the basis in the case of the property so acquired shall be the basis in the case of the stock or securities so sold or disposed of, except that if the repurchase price was in excess of the sale price such basis shall be increased in the amount of the difference, or if the repurchase price was less than the sale price such basis shall be decreased in the amount of the difference;

\* \* \* \* \* \* \*

ceding November 19, a period of eight days. During the twenty days from October 30 to November 19, he owned no Cyanamid shares, had no right to any, and knew not how the market price might vary in the event that he should purchase any. Sttrictly, therefore, he on October 30 sold and finally disposed of a "capital asset" and thereafter, by an entirely separate transaction, bought and sold a non-capital asset. There is nothing either in the general law or in the special statutory definitions which gainsays this.

Section 118, however, without changing the ordinary concept of loss and without denying its recognition, denies deduction of the loss sustained in the earlier sale. This is only because of the subsequent purchase. There is express recognition that the earlier loss has been sustained. The section has the narrow purpose of preventing a simple and transparent tax device by refusing the deduction, or, as the House Committee expressed it, "to prevent evasion of the tax through the medium of wash sales." [4] Unlike many other special statutory provisions, such as the reorganization provisions and the tax-free exchange provisions, it does not attempt to set up a new statutory scheme of "recognizing" or refusing recognition for tax pur-

---

[4] In proposing the first wash sale provision in the Revenue Bill of 1921, the House Committee on Ways and Means said in its report (Rept. No. 350, 67th Cong. 1st sess., p. 11):

"Section 214 would limit the deductions, for losses by providing that no deduction shall be allowed for losses sustained in the sale of securities where the taxpayer at or about the time of such sale purchases identical securities. This change will, if adopted, prevent evasion of the tax through the medium of wash sales."

The Report of the Senate Committee on Finance, p. 14, made this reference to the change:

"Section 214 allows substantially the same deductions in computing net income as are authorized under existing law, but adds the following provisions: * * *; (3) to prevent evasion through the medium of wash sales, it is provided that no deduction shall be allowed for losses sustained in the sale of securities where it appears that within 30 days after such sale the taxpayer purchases identical securities; * * *"

The Conference Report (No. 486) says, p. 24:

"The House bill provided that the taxpayer shall not be allowed any loss sustained in any sale of shares of stock where it appears that at or about the date of such sale the taxpayer has acquired identical property in substantially the same amount as the property sold, and that if such new acquisition is to the extent of part only of the identical property, then the amount of loss deductible shall be in proportion as the total amount of the property sold or disposed of bears to the property acquired. The Senate amendment extends the operation of the rule to cases where the acquisition of new property is within 30 days before or after the date of sale, but excepts from the operation of the rule the House bill cases where the new property is acquired by bequest of inheritance, and brings within the operation of the rule cases where the new property is substantially identical with the property sold, and provides, in case the new acquisition is to the extent of part only of substantially identical property, in lieu of the proportion provided by the House bill, that only a proportionate part of the loss shall be disallowed. The House recedes * * * with an amendment providing that the loss shall be disallowed only in cases where the property acquired is held by the taxpayer for any period after the sale of the old property, a provision made necessary by the extension of the rule, made by the Senate * * * to cases where the new property was acquired within 30 days before the date of the sale."

In the 1924 Act, the provision remained substantially the same, with an extension to cover instances in which the second purchase was for a price different from the earlier sale price.

poses of described transactions and of their normally resulting gains or losses. For its own purpose, it simply denies a deduction.[5]

The Commissioner's contention is, in effect, that section 113, which substitutes in respect of stock purchased after a so-called "wash sale" the base of the original shares for the base of the new shares (with an adjustment not necessary to consider here), must be read as identifying the new shares for all purposes with the original shares held. This construction, as already suggested, is one which is opposed to the literal meaning of the words describing "capital assets", and may be sustained, if at all, only as a necessary means of promoting the legislative purpose lying back of the capital gain provisions. The fear is that a literal interpretation would mar the harmony and symmetry of the statute.

Section 202 (d) (3) of the Revenue Act of 1921 is the prototype of section 113 (a) (11), and, to the extent that it provides that the later property involved in a wash sale should take the place of the earlier, it is limited "for the purposes of this section"[6] to the base to be used and therefore negates any broader implication which might be drawn from the more general language of the Congressional reports.[7]

That the later property is not to be identified with the earlier, even though section 118 prohibits deduction of the earlier loss, was the controlling reason for the Commissioner's refusal to apply the first in, first out rule in *Richard Coulter*, 32 B. T. A. 617. In that case it was said:

\* \* \* The fallacy, however, of the petitioner's position is in the idea that the wash sale disallowance connotes an identity in the shares sold and those purchased within the preceding 30 days. The wash sale statute is not concerned with the identity of the shares sold, but only provides categorically that the *deduction* shall be disallowed if any substantially identical property is acquired within 30 days. For the purpose of the wash sale provision, therefore, it is only necessary that the Commissioner should disallow so much

[5] In both the Gregg "Statement of the Changes Made in the Revenue Act of 1921 by H. R. 6715 and the reasons therefor", and the Committee Reports, it is apparent that no thought was given to correlating the wash sale provision with the capital gain and loss provision. This is likewise true of the Committee reports upon the revenue bills of 1926 and 1928.

[6] SEC. 202. (d) (3) Where no deduction is allowed for a loss or a part thereof under the provisions of paragraph (5) of subdivision (a) of section 214 and paragraph (4) of subdivision (a) of section 234, that part of the property acquired with relation to which such loss is disallowed shall for the purposes of this section be treated as taking the place of the property sold or disposed of.

\*     \*     \*     \*     \*     \*     \*

[7] The House report makes no mention of this subsection. The Senate Report, p. 12, makes this observation:

"Proper safeguards are found in subdivision (d), which provides that where property is exchanged for other property or where property is involuntarily converted into cash and the proceeds of such conversion are used to replace the property converted, or where a wash sale is not recognized, the property received in exchange shall be treated as taking the place of the original property."

of the loss as is proportionately applicable to 200 shares. In determining the measure of the loss sustained on the sale of the 500 shares on December 18, the first in, first out rule is no less applicable because part of the loss is precluded from deduction under the wash sale statute.

An examination of the legislative history of the capital gain provisions amply demonstrates that the reconciliation between that section and the wash sale provisions, here contended for by the Commissioner, is one which rests on no express words used in either of those sections in the 1921 or later revenue acts before the statute of 1932; and an examination of the Commissioner's interpretation of the 1921 and later acts shows that he consistently treated the two sections as wholly separate and distinct, and that his about-face is directly traceable to implications supposed to exist in the Supreme Court's decision in *Helvering* v. *New York Trust Co.*, 292 U. S. 455, decided May 28, 1934.

Section 101, like section 118, is a special provision which first appeared in the Revenue Act of 1921. It had its genesis in section 206 of that act, with a controlling purpose to promote transactions by limiting the tax on capital gains to 12½ percent and thus relieving them from the higher surtaxes.[8] It was originally conceived as entirely alleviatory and was thus directly opposite in purpose to the wash sale provision. It dealt, by express statutory definition, with specific property which had been held for more than two years, while the wash sale provision dealt broadly with "substantially identical" property. There is no word in all the legislative or administrative history of these two provisions which suggests a relation one with the other.

---

[8] In the House Committee Report on the Revenue bill of 1921, p. 10, is the following:

"Section 206: The sale of farms, mineral properties, and other capital assets is now seriously retarded by the fact that gains and profits earned over a series of years are under the present law taxed as a lump sum (and the amount of surtax greatly enhanced thereby) in the year in which the profit is realized. Many such sales, with their possible profit taking and consequent increase of the tax revenue, have been blocked by this feature of the present law. In order to permit such transactions to go forward without fear of a prohibitive tax, the proposed bill, in section 206, adds a new section (207) to the income tax, providing that where the net gain derived from the sale or other disposition of capital assets would, under the ordinary procedure, be subjected to an income tax in excess of 15 per cent, the tax upon capital net gain shall be limited to that rate. It is believed that the passage of this provision would materially increase the revenue, not only because it would stimulate profit-taking transactions but because the limitation of 15 per cent is also applied to capital losses. Under present conditions there are likely to be more losses than gains."

In the Senate Report, p. 12, is the following:

"Section 206 limits the rate of taxation upon gain derived from the sale of capital assets. Under the present law many sales of farms, mineral properties, and other capital assets have been prevented by the fact that gains and profits earned over a series of years are under the present law taxed as a lump sum and the amount of surtax excessively enhanced thereby. In order to permit such transactions to take place without fear of prohibitive tax, section 206 provides that only 40 per cent of the net gain derived from the sale or other disposition of capital assets shall be taken into account in determining the net income upon which the income tax is

In the 1924 Act, to the scheme of specially taxing capital gains was added a limitation upon the deduction for capital losses. It is apparent from the statutory provisions inserted at this time that the limitation of deduction for capital losses was balanced with the limitation in tax upon capital gains.[9] In the Treasury Regulations both were made applicable to "the specific property" which had been held for more than two years.[10] Specific exceptions were inserted in the

imposed. This automatically reduces the rate of taxes applicable to such income by 60 per cent. The maximum rate (normal and surtax) upon ordinary income after January 1, 1922, will be 40 per cent, and the maximum rate applicable to capital net gain will be 16 per cent. The House bill placed a similar limitation upon both capital gains and losses, but this limitation was not applicable to corporations nor to certain classes of taxpayers having net incomes less than $29,000. The Senate provision would permit a taxpayer to deduct the entire loss sustained in a capital transaction and is applicable to all classes of taxpayers. In Great Britain capital gain or loss is ignored or eliminated in computing the net income. Section 206 takes an intermediate position between the extreme views embodied, respectively, in the present American and British laws."

In the Conference Report, p. 20, it is said:

"The House bill defined the term 'capital assets' for the purposes of the section relating to the limitation of the tax on capital gains to mean only property acquired and held by the taxpayer for profit or investment. The Senate amendment added an additional limitation that such property must have been held for more than two years before its sale; and the House recedes.

\*      \*      \*      \*      \*      \*      \*

"The House bill limited the tax to 12½ per cent upon capital net gain and similarly limited the deduction allowance for capital net loss in the case of any taxpayer (other than a corporation) whose ordinary net income and capital net gain together exceed $29,000. Senate amendment 115 changes the House method of limiting the tax upon capital net gain, eliminates all reference to capital net loss, and makes this provision applicable to all taxpayers (including corporations) who for any taxable year derive a capital net gain. The House recedes with an amendment providing that in the case of any taxpayer (other than a corporation) who for any year derives a capital net gain there shall (at the election of the taxpayer) be collected, in lieu of the taxes imposed by sections 210 and 211, a tax consisting of the sum of (1) a partial tax computed upon the basis of the ordinary net income at the rates and in the manner provided in sections 210 and 211, and (2) 12½ per cent of the capital net gain; but if the taxpayer elects to be taxed under this section, the total tax shall in no such case be less than 12½ per cent of the total net income."

[9] Sec. 208. (b) In the case of any taxpayer (other than a corporation) who for any taxable year derives a capital net gain, there shall (at the election of the taxpayer) be levied, collected and paid, in lieu of the taxes imposed by sections 210 and 211 of this title, a tax determined as follows:

A partial tax shall first be computed upon the basis of the ordinary net income at the rates and in the manner provided in sections 210 and 211, and the total tax shall be this amount plus 12½ per centum of the capital net gain.

(c) In the case of any taxpayer (other than a corporation) who for any taxable year sustains a capital net loss, there shall be levied, collected, and paid, in lieu of the taxes imposed by sections 210 and 211 of this title, a tax determined as follows:

A partial tax shall first be computed upon the basis of the ordinary net income at the rates and in the manner provided in sections 210 and 211, and the total tax shall be this amount minus 12½ per centum of the capital net loss; but in no case shall the tax under this subdivision be less than the taxes imposed by sections 210 and 211 computed without regard to the provisions of this section.

[10] Regulations 62 (Revenue Act of 1921), art. 1651:

"The specific property sold or exchanged must have been held for more than two years."

The language of the regulations interpreting this section of Revenue Acts of 1924, 1926, and 1928, was identical:

"The specific property sold or exchanged must in general have been held for more than two years." [Regulations 65, art. 1651; Regulations 69, art. 1651; Regulations 74, art. 501.]

Revenue Act of 1926, section 208 (a) (8), in respect of property which had been received in an exchange, or by gift, or by distribution in prescribed cases.[11] These exceptions were carried into the 1928 statute without substantial change and are found in subparagraphs (A), (B), and (C) of section 101 (c) (8). The exceptions do not cover

[11] In proposing that the Revenue bill of 1926 expand the definition of capital assets to cover statutory reorganizatións, exchanges, and gifts, the House Committee Report, p. 6, says (Rept. No. 1, 69th Cong., 1st sess.) :

"Section 208 (a) (8) :

"The 12½ per cent capital gain and loss provisions apply only to the sale or exchange of capital assets which have been held by the taxpayer for two years. Under the reorganization provisions many transactions are exempt from tax until the stockholder disposes of his stock received as a result of the reorganization. As a result of this fact the question frequently arises as to whether the period that the taxpayer held the stock which he exchanged for new stock should be added to the period for which he held his new stock, in order to determine whether or not he has held it for two years. The amendment proposed to this section incorporates in the law the present regulation of the Treasury and provides that these two periods shall be added for the purpose of determining the period during which the property sold was held for the purpose of determining both gain and loss under this section. The same question arises in the case of property received by gift after December 31, 1920. The amendment provides that the period in which the property was held by the donor shall be added to the period in which the property was held by the donee in determining whether or not the property so received falls within the capital gain or loss section."

The Senate Committee Report upon the same subject is as follows (p. 18) :

"Section 208 (a) (8) : The 12½ per cent capital gain and loss provisions apply only to the sale or exchange of capital assets which have been held by the taxpayer for two years. Under the reorganization provisions many transactions are exempt from tax until the stockholder disposes of his stock received as a result of the reorganization. As a result of this fact the question frequently arises as to whether the period that the taxpayer held the stock which he exchanged for new stock should be added to the period for which he held his new stock, in order to determine whether or not he has held it for two years. The House bill incorporates in the law the present regulation of the Treasury and provides that these two periods shall be added for the purpose of determining the period during which the property sold was held for the purpose of determining both gain and loss under this section. The same question arises in the case of property received by gift after December 31, 1920. The House bill provides that the period for which the property was held by the donor shall be added to the period for which the property was held by the donee in determining whether or not the property so received falls within the capital gain or loss section.

"The committee recommends a further provision that in determining the period for which the taxpayer has held stock or securities received upon a distribution where no gain is recognized to the distributee under section 203 (c) of this bill or the revenue act of 1924 there shall be included the period for which he held the stock or securities in the distributing corporation. Inasmuch as section 203 (c) in this bill and in the revenue act of 1924 is broad enough to include the case of stock dividends, the committee amendment takes care of the determination of the two-year period in the case of stock dividends, as to which the present Treasury regulations apply the same rule."

The Conference Report (Rept. No. 356, 69th Cong., 1st sess., p. 32) contains the following :

"The 12½ per cent capital gain and loss provisions apply only to the sale or exchange of capital assets which have been held by the taxpayer for two years. This amendment provides that in determining the period for which the taxpayer has held stock or securities received upon a distribution where no gain is recognized to the distributee under secton 203 (c) of this bill or the revenue act of 1924, there shall be included the period for which he held the stock or security in the distributing corporation. Inasmuch as section 203 (c) in this bill and in the revenue act of.1924 is broad enough to include the case of stock dividends, this amendment takes care of the determination of the two-year period in the case of stock dividends as to which the present Treasury regulations apply the same rule; and the House recedes."

wash sales or suggest any relation between the wash sale provision and the capital gain and loss provision.

In the administration of the statute, the Government had disclaimed any intention to regard the wash sale provision as affecting the capital loss provision. In 1927, interpreting the wash sale provision of the Revenue Acts of 1924 and 1926, the General Counsel issued G. C. M. 1210, VI-2 C. B. 60, tacitly recognizing the lack of identity between the new property and the old property involved in a wash sale transaction, and stating the method for determining the measure of the deduction allowable upon the second sale. The capital loss provision was not mentioned. In the latter part of 1928, this ruling was modified by I. T. 2443, C. B. VII-2, p. 127, in respects not material to our present inquiry, and in this ruling we find the following:

With reference to the capital gain and loss provisions of section 208 of the Revenue Act of 1926, it is noted that although the deduction of any loss is postponed in the case of such "wash sales" until there is a disposition of the stock with no repurchase within the proscribed period, the stock in the case under consideration was not held for a period of more than two years. During the period from the date of the "wash sale" to the date of repurchase the taxpayer did not own or hold any stock. The two-year period in such case, for the purpose of the capital gain and loss provisions of section 208, accordingly runs from the date of the repurchase and not from the date of the original purchase.

In 1931 both of the foregoing rulings were carried along with apparent approval in I. T. 2576, C. B. X-1, p. 164, in which they were cited without reservation. Thus, so far as published rulings disclose, it is safe to say that the unvarying practice of the Government from the beginning of the period when the special wash sale provision was in force and through the time when the particular transactions now before us took place, was to treat the second transaction as a sale of property different from that earlier sold and to regard the capital loss provision as inapplicable. This practice, so far as we can find either from this record or from the published rulings, continued throughout the period of effectiveness of the 1928 Act until the latter part of 1934, when, in I. T. 2832, XIII-2 C. B. 201, there was a "modification" of I. T. 2443, and it was held that the two-year period of the capital assets section under the Revenue Act of 1928 and prior acts "runs from the date of acquisition of the original securities, and not from the date of repurchase." In support of this entirely new ruling, the statement is made "see generally the reasoning contained in the decision of the United States Supreme Court in *Helvering* v. *New York Trust Co., Trustee*, 292 U. S. 455."

We are thus brought to the question whether the decision of the Supreme Court requires this present overthrow of established inter-

pretation and practice. That decision did not at all consider the capital gain provisions in relation to the wash sale provision. Two questions were raised, only one of which is germane to our inquiry here. The first was whether property received by the taxpayer in trust for another was "acquired by gift" by the trustee within the meaning of section 202 (a) (2), Revenue Act 1921, which substituted the basis of the property in the hands of the donor for the basis it would ordinarily have had in the donee's hands. The constitutionality of this provision had been sustained by the Supreme Court in *Taft* v. *Bowers*, 278 U. S. 470. In the *New York Trust Co.* case this question was resolved in the Government's favor, and the trust property was held to be a gift. The second question arose, whether, since the donee must take the donor's base, he would be entitled to tack his tenure to that of his donor in order to obtain the benefit of the capital gain provision, which, as already pointed out, allowed the lower rate of 12½ percent on gains on "property acquired and held by the taxpayer * * * for more than two years." The Court held that "the continuity required to be used to get the base was also intended for use in finding the rate. No valid ground has been suggested for requiring tenures to be added for the one purpose and forbidding combination for the other. The legislative purpose to be served by the application of the lower rate upon capital gains is directly opposed to the Commissioner's construction."

In *Taft* v. *Bowers*, *supra*, the Court pointed out that the appreciation in value of the gift in the donor's hands, which on its severance from the original capital would constitute income, did not lose its character as income under the Sixteenth Amendment on transference to the taxpayer as donee, cf. *Irwin* v. *Gavit*, 268 U. S. 161; and that, since the statute specifically held gifts not to be income, there was no realization of gain or loss until the donee's later sale, when the increase accumulating, both in the donor's hands and the donee's hands, became separated and realized; and that, since the donee accepted the benefit of the gift with knowledge of its burden, Congress deprived her of no right and subjected her to no hardship in laying a tax on the entire increase. The donee stepped into the shoes of the donor for all purposes. This doctrine goes far to explain the *New York Trust Co.* decision.

As already said, the capital gain provision as it stood in the 1921 Act was wholly remedial in nature. Reference to the Committee Report quoted in the margin, *supra*, (footnote 8) shows that the House, while limiting capital gains, proposed also to limit capital losses, and even suggested as a reason for adoption of the new provision that "under present conditions there are likely to be more losses than gains." The Senate, however, thought otherwise, and, while fixing the limitation on capital gains, permitted the taxpayer to deduct his

entire capital loss. The Senate view prevailed, the House receded, and as a consequence, the capital gain provision afforded a substantial benefit to the taxpayer without any corresponding burden. That the House view prevailed in later revenue acts is immaterial here, for it was the 1921 Act which the Supreme Court dealt with in the *New York Trust Co.* case. And it seems beyond question that the Court considered the capital gain provision solely in the light of an alleviatory measure, for it there said:

> In respect of the legislative purpose to lessen hindrance caused by high normal and surtaxes, there is no distinction between gains derived from a sale made by an owner who has held the property for more than two years and those resulting from one by a donee whose tenure plus that of the donor exceeds that period.

And again:

> There is no ground for discrimination such as that to which the trustee was subjected. It is to be inferred that Congress did not intend penalization of that sort.

These were the reasons for a liberal interpretation of the statute. The opinion discloses nothing to indicate that without these considerations the same decision would have been reached.

In the present case these considerations are absent. Since the amendment of the 1924 Revenue Act, imposing a limitation on capital losses, as well as allowing the limitation on capital gains, the provision no longer confers an unmixed blessing on the taxpayer. Moreover, while the benefit of the gains limitation is left to the taxpayer's option, the limitation on his deduction of capital losses is absolute. The principle of conforming the rate to the base, thought necessary by the Court in that case to promote the statute's purpose, might well under a later statute lose much of its compelling force; and certainly such conformity of rate to base is not to be resorted to in all cases as a general principle of construction. Cf. *McFeely* v. *Commissioner*, 296 U. S. 102.

But there are still more significant differences which forbid the application of the *New York Trust Co.* case's rule to the present situation. In that case the same specific property was held throughout and the only question was whether there might be a tacking of the tenures of both donor and donee; here the original property was sold, new property was acquired and the new property by specific words in the statute is given not the same base as the old, but a new base calculated with express regard for the second transaction. In the *Taft* case, because of the continuity of holding of specific property without any recognizable break for tax purposes, in the successive hands of donor and donee, the original base was thought justified; and, by extension, the same principle was applied in the *Trust Co.* case to the rate, the holdings of the two being merged.

Since the burden of tax upon the entire increment is laid on the donee when realized, it is not unreasonable that he should have the correlative benefit. But here specific property is sold and the occasion for realizing gain or loss thus arises. Realization takes place. The statute does not forbid the recognition of gain on the first sale, and in case of loss it forbids only the deduction. The statute by one provision disallows the wash sale deduction and by another, in the event of such a disallowance, fixes a new base. Because of the disallowance of the loss deduction on the wash sale, it is contended that the taxpayer's tenure of the new and entirely distinct property should, despite the intervening lapse, be tacked to the tenure of his old, in order to establish the rate, regardless of the fact that if the result of the original sale had been a gain, his two periods would not have been tacked. Congress may conceivably tack the same taxpayer's tenures of different pieces of property for tax purposes as it does the tenures of the same property held by successive taxpayers, but, in the absence of a clear indication of intention to do so, there must be some logical necessity for adopting a construction contrary to the plain words of the statute. No such logical compulsion exists here, for the result sought by the Commissioner would lack the very balance and harmony which is said to be its justification. The wash sale provision and its dependent provision, changing the base of property coming within its terms, is too narrow in its intent and effect to be extended by implication.

In *McFeely* v. *Commissioner, supra*, it was urged by the Commissioner that the decision in the *New York Trust Co.* case required a construction of the capital gain provision of the 1928 Act which would fix the same date for the beginning of the holding period as section 113 (a) (5) sets for determining the base of property transmitted at death. The latter provision expressly sets in certain cases the date of distribution of property as the basic date for fixing value. The taxpayers took, some through intestacy and some through general bequests, and thus fell within this provision. The Court thought that the word "held", as used in the capital gain provision, did not mean mere physical possession, but connoted beneficial ownership, and on this reasoning held that the residuary legatee's ownership related back to the date of decedent's death, notwithstanding the intervening legal title of the executor. His holding, therefore, for the purpose of determining the applicable rate, would begin at decedent's death, but his holding, for the purpose of fixing his base, would begin only on distribution. In answering the argument raised on the *New York Trust Co.* case that the base in one section must be harmonized with the rate in the other, the Court said:

We think, however, that the case is not authority here. The Act of 1921 exhibited an inconsistency in that while a donee was permitted to tack his

tenure to that of his donor, he was not permitted to use his donor's basis. This inconsistency flowed from a literal reading of the separate sections dealing with these two subjects. Such a result the court held would run counter to the very policy and purpose of the capital gains rate reduction, which was to encourage sales of capital assets, and would penalize the taxpayer making such sales. The departure from the strict terms of the act was justified in order to secure him the benefit intended to be conferred. The court was careful to say "The rule that where a statute contains no ambiguity, it must be taken literally and given effect according to its language is a sound one * * *." That rule was held inapplicable for the reasons stated.

The *New York Trust Co.* case was decided in May 1934 and it was not until later in 1934 that I. T. 2832 was issued in reliance upon the *New York Trust Co.* decision and modifying I. T. 2443, which, as we have seen, continuously held that the two-year period "runs from the date of repurchase and not from the date of the original purchase." Meanwhile, the matter had come to the attention of the Congress in its consideration of the Revenue Bill of 1932. In the Report of the House Committee on Ways and Means (No. 708, 72d Cong., 1st sess., p. 16), the operation of the existing law under the Revenue Act of 1928 was fully recognized and a deliberate change was proposed. The Committee Report on this subject is quoted in full in the margin.[12]

---

[12] Sections 101 (c) (8), 113 (a) (11), and 118. WASH SALES.

The 12½ per centum limitation imposed by section 101 (b) of the 1928 act upon losses from the sale of property held for more than two years, is easily avoided in the case of stock or securities. A taxpayer, desirous of taking a loss on stock which he has held for more than two years, would sell the stock, "repurchase" it within 30 days, and then sell the repurchased stock. The loss on the first sale (the "wash" sale) would not, by reason of section 118, be allowed as a deduction, but the repurchased stock would have substantially the high basis of the stock sold (under section 113 (a) (11)). Since the repurchased stock would not have been held for more than two years when sold, the loss on its sale would not be a "capital loss" but an "ordinary deduction" allowable without limitation. Thus the taxpayer would end in virtually the same financial position as if he had made an outright sale in the first instance but would escape the limitation under section 101 (b) which would have applied if he had made an outright sale.

For example, A bought stock in 1927 for $100,000, which stock was worth $50,000 in 1931. In November, 1931, A sold his stock for $50,000 and repurchased identical stock within thirty days for the same amount. By reason of section 118 of the present law, A is denied a deduction for the $50,000 loss, and under section 113 (a) (11) of the present law, his new stock takes $100,000 as its basis. Thereafter, A again sold the repurchased stock for $50,000. A is entitled under the present law to deduct a loss of $50,000 from his gross income and is not subjected to the 12½ per centum limitation to which he would be restricted under section 101 (b) of the present law had he simply sold his original stock.

Such anomalous results are precluded by subparagraph (D) of section 101 (c) (8) of the new bill, which requires the taxpayer to add to the period for which he has held the stock or securities purchased in connection with a "wash" sale, the period for which he had held the stock or securities sold. Under the proposed bill in the above example A would be subject to the 12½ per centum limitation on his loss.

In many cases of "wash" sales the shares disposed of in the "wash" sale have been purchased at different times and at different prices, or the shares repurchased in connection with the sale are subsequently sold at different times and at different prices, or the number of shares repurchased are greater or less than the number of shares sold. In all such cases some allocation as between the shares sold and the shares repurchased is absolutely essential in order to apply the new "tacking" provision included in section 101 (c) (8); and such allocation is, in fact, equally desirable in determining the amount

The Report of the Senate Committee is also set out in the margin,[13] and we think recognizes, no less than the House Report, the situation which was to be changed. The law was amended in the Revenue Act of 1932, by adding the following paragraph to section 101 (c) (8):

(D) In determining the period for which the taxpayer has held stock or securities the acquisition of which (or the contract or option to acquire which) resulted in the nondeductibility (under section 118 of this Act or the Revenue Act of 1928, relating to wash sales) of the loss from the sale or other disposition of substantially identical stock or securities, there shall be included the period for which he held the stock or securities the loss from the sale or other disposition of which was not deductible.

---

of the loss to be disallowed in the "wash" sale and the basis for computing future gain or loss on the shares repurchased in connection with the "wash" sale. In the prior act it was assumed that such identification or allocation was unnecessary or, if necessary, could readily be made. In the types of cases mentioned above an accurate allocation is often impossible, and resort must be had to some rule of thumb. As it would be impracticable to state in the act a rule of uniform application to all the possible types of cases, it is provided in subsections (b) and (c) of section 118 that such allocation shall be made under rules and regulations to be prescribed by the commissioner. The allocation so made will, of course, be applicable not only for the purpose of section 118 but also for the purposes of sections 101 (c) (8) and 113 (a) (11). In view of this new provision the last sentence of section 118 of the 1928 act has been eliminated.

Section 118 has been amended to show clearly that the wash sale provisions apply to sales and repurchases occurring on the same day; this change is regarded as declaratory of the existing law and is made in the interest of clarity only. The section has also been amended to. make it clear that it applies only to cases of the acquisition of substantially identical stock or securities by purchase or through a taxable exchange on which the gain or loss was fully recognized; the result of the amendment is to eliminate any possibility of a conflict between section 113 (a) (11) and other basis provisions of the law. Other changes in the language of sections 113 (a) (11) and 118 are for clarification only.

[13] SECTIONS 101 (c) (8) (D), 113 (a) (11), and 118. WASH SALES.

Section 101 (c) (8) of the existing law recognizes that in certain cases where the gain or loss basis of old property carries over, in whole or in part, to newly acquired property, the newly acquired property is regarded as taking the place of the old property and the two are regarded as the same property for the purpose of determining the period the property was held. The existing law does not specifically cover the cases of property acquired in connection with a wash sale, although no loss from such sale was recognized under section 118 and the basis of the old property is carried over in whole or in part under section 113 (a) (11) to the new property. Your committee sees no reason why property acquired under these circumstances should not be accorded the same treatment as is accorded in other similar cases. Accordingly, a new subparagraph (D), added to section 101 (c) (8) by the House bill, is concurred in by your committee.

In many cases of "wash" sales the shares disposed of in the "wash" sale have been purchased at different times and at different prices, or the shares repurchased in connection with the sale are subsequently sold at different times and at different prices, or the number of shares repurchased are greater or less than the number of shares sold. In all such cases some allocation as between the shares sold and the shares repurchased is absolutely essential in order to apply the new "tacking" provision included in section 101 (c) (8) ; and such allocation is, in fact, equally desirable in determining the amount of the loss to be disallowed on the "wash" sale and the basis for computing future gain or loss on the shares repurchased in connection with the "wash" sale. In the prior act it was assumed that such identification or allocation was unnecessary or, if necessary, could readily be made. In the types of cases mentioned above an accurate allocation is often impossible, and resort must be had to some rule of thumb. As it would be impracticable to state in the act a rule of uniform application to all the possible types of cases, it is provided in subsections (b) and (c) of section 118 that such allocation shall be made under rules and regulations

There can be no doubt, therefore, that from the time when the 1932 Revenue Act became law the composite loss from the first and second sales was to be treated as a capital loss if the period of the combined tenures of the original and of the newly purchased stock was two years or more. The Commissioner, however, treats paragraph (D), *supra*, of the 1932 Act as merely a clarifying provision of existing law. This is without foundation. It is a new provision. Congress might indeed have undertaken to make it retroactively effective to cover situations antedating its enactment, but it failed to do so. In the light of its unmistakable knowledge of the operation of the existing law, appearing from its Committee Reports, there can be no doubt that the failure to make the provision retroactive was deliberate. Neither the Commissioner nor the Board has power to change the effect of this deliberate choice of Congress by construing the provision of the 1932 Act as if it had been made retroactive. And this is likewise true of any present attempt by the Commissioner to make his present interpretation of the 1928 Act retroactive. All considerations appear to support the taxpayer's view, unless there is to be read in the opinion of the *New York Trust Co.* case an application by indirection to wash sales.

The determination of the Commissioner is reversed.

■ The second question, which arises for both the years 1931 and 1932, is whether petitioner in computing the deductible amount of certain stipulated contributions to charity in those years is limited to 15 percent of "net income" as prescribed by section 23 (n), Revenue Act of 1928, and the corresponding section of the Revenue Act of 1932, without any diminution thereof by reason of capital net losses sustained by him in those years. This question is present on the facts for the year 1931, regardless of how the first point in this case is decided, since petitioner sustained other losses in that year which were admittedly capital losses.

The present situation offers the converse of the question considered by the Supreme Court in *Helvering* v. *Bliss*, 293 U. S. 144. There the Court held that "net income", for the purpose of computing the

to be prescribed by the commissioner. The allocation so made will, of course, be applicable not only for the purpose of section 118 but also for the purposes of sections 101 (c) (8) and 113 (a) (11). In view of this new provision the last sentence of section 118 of the 1928 act has been eliminated.

Section 118 has been amended to show clearly that the wash sale provisions apply to sales and repurchases occurring on the same day; this change is regarded as declaratory of the existing law and is made in the interest of clarity only. The section has also been amended to make it clear that it applies only to cases of the acquisition of substantially identical stock or securities by purchase or through a taxable exchange on which the gain or loss was fully recognized; the result of the amendment is to eliminate any possibility of a conflict between section 113 (a) (11) and other basic provisions of the law. Other changes in the language of sections 113 (a) (11) and 118 are for clarification only.

900

15 percent deduction for charitable contributions, was not "ordinary net income" as defined by section 101 (c) (7), in distinction from "capital net gain", but was gross income, less all permissible deductions under section 23, and thus included capital gain. The Court further held that the deduction of gifts to charity, to the extent allowed, were "ordinary deductions" and as such would not diminish the income taxable as capital gain; a construction, it was said, which flowed necessarily from the public policy lying back of the two provisions, to liberalize the law in the taxpayer's favor. The Court thought, in other words, that, since both the allowance of a charitable deduction and the reduction of the rate of tax on capital gains had the same purpose of lightening the taxpayer's burden, the latter privilege should not be held to circumscribe or limit the former.

In the instant case it will be seen that the capital loss provision indirectly works to the petitioner's advantage, when read in conjunction with the provision for deducting charitable contributions, for while the former section limits the amount of losses to the petitioner's disadvantage, it increases the amount of his total net income, and to that extent, therefore, enlarges the charitable deduction which is measured by a percentage of that income. The ameliorative purpose of the two sections is therefore retained here. And there is nothing in the *Bliss* decision which warrants going farther.

The same question has already been considered in *James H. Lockhart*, 32 B. T. A. 732 (on review, C. C. A., 3d Cir.); *Sewell L. Avery*, 32 B. T. A. 948; affd., 84 Fed. (2d) 905; and *Louis W. Hill*, 33 B. T. A. 891 (on review, C. C. A., 8th Cir.), and there is in the petitioner's argument no persuasive reason for overruling them. In computing the deduction for charitable contributions, the petitioner's net income, after deducting capital net loss, constitutes the proper measure of the percentage.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

ARUNDELL, dissenting: I differ with the majority on the first point in this case. I think that the reasoning of the Supreme Court in *Helvering* v. *New York Trust Co.* is authority for the respondent's position here, which follows ruling I. T. 2832. In that case, as in this, there was a statutory provision for determining the basis, but none directly specifying the method of computing the period of holding. The Commissioner, in the *New York Trust Co.* case, went

back to the acquisition by the donor to get the basis and then treated the periods of holding by the donor and donee as separate in ascertaining the rate. The Court disapproved, saying:

Sections 202(a)(2) [the basis provision] and 206(a)(6) [the capital assets provision] are included in the same Act and are applicable respectively to different elements of the same or like transactions and are not to be regarded as wholly unrelated. While undoubtedly legally possible and within the power of Congress, the methods adopted and results attained by the Commissioner are so lacking in harmony as to suggest that the continuity required to be used to get the base was also intended for use in finding the rate. No valid ground has been suggested for requiring tenures to be added for the one purpose and forbidding combination for the other.

It seems to me that there is even more reason here for requiring the use of the same period for both purposes, inasmuch as here we have at all times the same taxpayer, while in the *New York Trust Co.* case there was a different taxpayer in each period.

The only ruling directly dealing with this question prior to I. T. 2832, appears to be I. T. 2443. The *New York Trust Co.* opinion points out that rulings of the Income Tax Unit "have none of the force or effect of Treasury Decisions and do not commit the Department to any interpretation of the law." Consequently, it cannot be said that I. T. 2443 had any binding effect requiring that it be followed in this case.

I do not construe paragraph (D) of section 101(c)(8) of the Revenue Act of 1932 as effecting a change in the law either prospectively or retroactively. There was no provision of the statutory law directly dealing with the question and there had been no authoritative ruling when the 1932 Act was passed. The decision in the *New York Trust Co.* case furnished the first authoritative guide to a solution. It was the first judicial interpretation, and it is interpretation by the judiciary that is definitive. The House Ways and Means Committee and the Senate Finance Committee apparently had different views as to the statutes prior to 1932 and as to the effect of paragraph (D). The House Committee thought that the prior law did not require tacking of the periods of holding, while the Senate Committee thought that paragraph (D), requiring tacking, was merely "declaratory of the existing law and is made in the interest of clarity only." This conflict of views makes the reports of but little aid in determining the correct interpretation of the prior law. Moreover, legislative interpretation—if the Committee reports can be considered as such—while of weight in assisting a court when in doubt (*United States* v. *Stafoff*, 260 U. S. 477, 480), is "immaterial in that the courts alone may in the end declare what a statute means." *American Exchange Securities Corporation* v. *Helvering*, 74 Fed. (2d) 213. It is my view that in the analogous

situation in the *New York Trust Co.* case the Supreme Court gave a clear indication of what the statute means, to wit, that the periods of holding by the taxpayer should be added together in order to determine whether property is a capital asset. So viewed, the Commissioner should be affirmed on this point.

MURDOCK agrees with this dissent.